**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **PROJECT ON GOVERNMENT OVERSIGHT, INC.**<br>1100 13th Street NW<br>Suite 800<br>Washington, DC 20005<br><br>        Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF STATE**<br>The Executive Office<br>Office of the Legal Advisor<br>Suite 5.600<br>600 19th Street, NW<br>Washington, DC 20522<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. |

**COMPLAINT**

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. §§ 220 and 2202, for injunctive, declaratory, and other appropriate relief. Plaintiff Project On Government Oversight, Inc. ("POGO") challenges the failure of the U.S. Department of State ("State") to provide POGO on an expedited basis with all non-exempt documents responsive to two FOIA requests POGO filed with State seeking documents related to (1) State's Civilian Harm Incident Response Guidance ("CHIRG"), and (2) State's statutory obligation to maintain a list of all Israeli security force units receiving United States training, equipment, or other types of assistance, and the United States's transfer of arms to Israel.

**JURISDICTION AND VENUE**

2.     This Court has subject matter jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331

3.     Venue lies in this district under 5.U.S.C § 552(a)(4)(B).

**PARTIES**

4.     Plaintiff POGO is a nonpartisan independent organization based in Washington, D.C. and organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles. POGO's investigators and journalists take leads and information from insiders and verify the information through investigations using FOIA, interviews, and other fact-finding strategies. POGO's investigative work has been recognized by Members of Congress, executive branch officials, and professional journalism organizations. For instance, in 2015, POGO won the Robert D.G. Lewis Watchdog Award, the Society of Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, for reporting on the Department of Justice's opaque system for handling allegations of attorney misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing Business Editing & Writing for its investigative series scrutinizing the government's oversight of offshore drilling. POGO extensively used records obtained under FOIA for this investigation.

5.     Defendant State is a federal agency within the meaning of FOIA, 5 U.S.C. § 552(f), and has possession and control of the records POGO seeks in this action.

## STATUTORY BACKGROUND

6.      The FOIA requires federal agencies, upon request, to make records "promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless one or more specific statutory exemptions apply.

7.      The agency must provide the public records when they are requested in order "to ensure an informed citizenry, vital to the functioning democratic society." *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

8.      The FOIA also requires agencies to promulgate regulations that provide for the expedited processing of FOIA requests where the requester demonstrates "compelling need" as well as in "other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i). The FOIA defines "compelling need" to include requests "made by a person primarily engaged in disseminating information" where there is an "urgency to inform the public concerning actual or alleged Federal Government activity." *Id.* at § 552(a)(6)(E)(v)(II).

9.      State regulations at 22 C.F.R. §171.12(b)(i) define "urgently needed" for purposes of expedition as involving information that "has a particular value that will be lost if not disseminated quickly," which "[o]rdinarily . . . means a breaking news story of general public interest."

10.      Agencies are required to make a determination on a request for expedition within 10 calendar days "after the date of the request." 5 U.S.C. § 552(a)(6)(E)(ii)(I). State Department regulations mirror this requirement. 22 C.F.R. §171.12(b).

11.      Once an agency grants expedition it must process the request "as soon as practicable." 5 U.S. C. § 552(a)(6)(E)(ii).

12.     An agency's failure to respond within 10 calendar days to a request for expedition is subject to judicial review without exhausting judicial remedies. 5 U.S.C. § 552(a)(6)(E)(iii).

13.     Agency decisions to deny or affirm denial of a request for expedition are subject to judicial review "based on the record before the agency at the time of the determination." 5 U.S.C. § 552(a)(6)(E)(iii).

14.     For non-expedited requests an agency must make a determination within twenty business days and notify the requester which of the requested records it will release, which it will withhold and why, and the requester's right to appeal the determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

15.     The twenty-day deadline for an agency to make a determination on a request begins on the earlier of: (l) the date "the request is first received by the appropriate component of the agency" or (2) "ten days after the request is "first received by any component of the agency that is designated in the agency's regulations . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(ii).

16.     In unusual circumstances, an agency may extend the time limits the FOIA prescribes for non-expedited requests by written notice to the person making such request that sets forth the reasons for such extension and the date on which a determination is "expected" to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B)(i).

17.     If an agency does not respond to a FOIA request by the statutory deadline, the requester is deemed to have exhausted administrative remedies and may immediately pursue judicial review. 5 U.S.C. §§ 552(a)(6)(C)(i), 552(a)(4)(B).

**FACTUAL BACKGROUND**

*October 7, 2023 Hamas Terrorist Attacks*

18.     On October 7, 2023, the Palestinian Sunni Islamist group Hamas (a U.S.-designated foreign terrorist organization, or FTO) led surprise attacks against Israel from the Gaza Strip. *See* https://crsreports.congress.gov/product/pdf/R/R47828#:~:text=On%20October%207%2C%202023%2C%20the,citizens%20in%20Israel)%20were%20killed.

19.     Approximately 1,200 Israelis and foreign nationals (including at least 31 U.S. citizens in Israel) were killed during those initial attacks. Hamas and other groups also seized 253 hostages on October 7. https://www.nytimes.com/2023/11/12/world/middleeast/israel-death-toll-hamas-attack.html.

20.     In response to the October 7 attacks, Israel declared war on Hamas and launched aerial bombardment and ground operations in Gaza. As of May 27, 2024, more than 36,000 Palestinians in Gaza had been killed, according to the Hamas-controlled Gaza health ministry. https://www.npr.org/2024/05/27/nx-s1-4982690/rafah-encampment-israeli-airstrike-hamas.

21.     To provide aid and support, President Biden asked Congress to appropriate more than $14 billion in Israel-related funding, and more than $9 billion in global humanitarian assistance.

22.     Members of Congress have expressed differing views on the request and its various elements, and debate has increased in intensity over what level of oversight or conditionality (if any) Congress should place on security assistance to Israel and humanitarian assistance to Gaza. The House and Senate have each passed bills and continue to deliberate on the way forward.

23.     Since October 7, 2023, most U.S. Foreign Military Sales ("FMS") and Direct

Commercial Sales ("DCS") to Israel were previously approved for delivery and accelerated.

Because their dollar value fell below the prior notice threshold for transfers to Israel Congress

was not notified. *Id.*

24.     For example, the United States supplied Israel with 1,000 precision guided bombs

in 2023. https://www.washingtonpost.com/world/2024/05/29/rafah-strike-us-munition-israel/.

25.     The Biden administration has not halted transfers of this munition over the course

of the war. In April 2024, the State Department approved a transfer of more than 1,000 GBU-

39/B small-diameter bombs with containers on the same day that Israeli forces bombed a convoy

of World Central Kitchen aid workers in Gaza, killing seven. *Id*.

26.     The increase in funding and military aid and weapon sales, combined with a lack

of congressional oversight, was a cause for concern among certain members of Congress.

27.     Following President Biden's request for approval of $14.3 billion in supplemental

military aid to Israel, lawmakers called for increased accountability and oversight measures to

ensure any use of U.S. weapons accords with U.S. policy and international law. *See*

https://www.warren.senate.gov/oversight/letters/warren-kaine-sanders-merkley-heinrich-call-for-

oversight-of-use-of-us-origin-weapons-by-israel-in-war-against-hamas.

28.     After reports that Israel is using explosive weapons against civilian targets,

causing widespread harm, U.S. Senators Elizabeth Warren, Tim Kaine, Bernie Sanders, Jeff

Merkley, and Martin Heinrich, sent a letter to President Biden requesting closer oversight of

Israel's use of U.S. weapons to ensure the weapons will not be used to cause preventable civilian

harm. *Id*.

*Civilian Harm Incident Response Guidance*

29.     Shortly before the October 7 terrorist attacks, the Biden Administration enacted

the Civilian Harm Incident Response Guidance ("CHIRG"), whose purpose is to reduce civilian

harm caused by U.S. military operations and stemming from U.S. arms exports. *See*

https://www.warren.senate.gov/imo/media/doc/2023.12.05%20Letter%20to%20President%20Bi

den%20re%20Civilian%20Harm%20from%20Israel's%20use%20of%20U.S.%20Weapons%20i

n%20Gaza.pdf.

30.     CHIRG, which is administered by State and conducted through the Department of

Defense ("DOD"), created:

> a "formal system for monitoring and potentially penalizing reported
> abuses involving foreign forces and U.S.-origin arms" to fill gaps in
> traditional "end use monitoring" safeguards — including by
> evaluating how weapons are used by foreign partners. The
> administration also "issued a formal order" on conventional arms
> transfer policy that prohibited "weapons transfers to countries where
> it is 'more likely than not' that the weapons will be used…
> 'intentionally… against civilian objects or civilians.'"

*Id.*

31.     According to senior State official Christopher Le Mon the guidelines formalized

activities that had previously occurred in an ad hoc manner, creating a codified process that "isn't

dependent upon workload, bandwidth, or political will to go out and investigate incidents." *See*

https://www.washingtonpost.com/national-security/2023/09/13/state-department-chirg-civilian-

deaths/.

32.     Prior to CHIRG, State relied primarily on the Leahy Law which:

> refers to two statutory provisions prohibiting the U.S. Government
> from using funds for assistance to units of foreign security forces
> where there is credible information implicating that unit in the
> commission of gross violations of human rights ["GVHR"]…One
> statutory provision applies to the State Department and the other

applies to the Department of Defense…[t]he U.S. government considers torture, extrajudicial killing, enforced disappearance, and rape under color of law as GVHRs when implementing the Leahy law. Incidents are examined on a fact-specific basis. The State Department Leahy Law includes an exception permitting resumption of assistance to a unit if the Secretary of State determines and reports to Congress that the government of the country is taking effective steps to bring the responsible members of the security forces unit to justice.

*See* https://www.state.gov/key-topics-bureau-of-democracy-human-rights-and-labor/human-rights/leahy-law-fact-sheet/.

33.    Unlike the Leahy Law, which screens foreign forces with the goal of ensuring that units guilty of GVHR don't receive U.S.-funded training or education, CHIRG calls for examination of specific incidents and seeks to document abuses that fall short of the "grave violations" standard.

*U.S. Policies for Israeli Military Sales Are Contrary to Leahy Law and CHIRG*

34.    Despite its intentions, the application of CHIRG appears to be unequally enforced with respect to Israel. Reportedly,

> [t]op US officials quietly reviewed more than a dozen incidents of alleged gross violations of human rights by Israeli security forces since 2020, but have gone to great lengths to preserve continued access to US weapons for the units responsible for the alleged violations, contributing – former US officials say – to the sense of impunity with which Israel has approached its war in Gaza.
> …
> An investigation by the Guardian, which was based on a review of internal state department documents and interviews with people familiar with sensitive internal deliberations, reveals how special mechanisms have been used over the last few years to shield Israel from US human rights laws, even as other allies' military units who receive US support – including, sources say, Ukraine – have privately been sanctioned and faced consequences for committing human rights violations.

*See* https://www.theguardian.com/world/2024/jan/18/us-supply-weapons-israel-alleged-abuses-human-rights.

35.     Special mechanisms have been used to allow continued foreign arms sales to Israel, despite credible reports of numerous human rights violations. *Id.*

36.     Under the Leahy Law, for most countries and in most cases, a foreign military unit is granted US military assistance or training only after it is vetted by State for any reported human rights violations. Further, the Leahy Law prohibits State and DOD from providing funds, assistance, or training to foreign security force units where there is credible information that the forces have committed a GVHR.

37.     "In the case of at least three countries – Israel, Ukraine and Egypt – the scale of foreign assistance is so great that US military assistance can be difficult to track, and the US often has no knowledge of where specific weapons end up or how they are used." *See* https://www.theguardian.com/world/2024/jan/18/us-supply-weapons-israel-alleged-abuses-human-rights.

38.     Allegations of Israeli GVHR are supposed to be subject to a process called the Israel Leahy Vetting Forum ("ILVF"), in which representatives from relevant State Department bureaus examine reports of alleged human rights violations by Israeli forces.

39.     However, Israel has benefited from "extraordinary policies" inside the ILVF.

> First, under the Israel process, all of the parties involved in an ILVF review must reach a consensus that a potential violation has occurred, and must then be approved by the deputy secretary of state, according to three people familiar with internal deliberations. In theory, a single bureau could raise a potential violation to the deputy Secretary of State level as part of a "split memo", in which other bureaus would air their disagreement, but no such thing has occurred… For other countries, former officials said, such a Leahy Law determination is made by State Department staff, does not

9

> require the consensus of all parties, and would not require notification of and approval by the Secretary of State or deputy.
>
> …
>
> Second, Israel must be consulted about alleged human rights violations that are under review and has 90 days to respond to claims, creating what some former officials said were significant delays. No other country's government must be consulted under State Department procedures.

*See* https://www.theguardian.com/world/2024/jan/18/us-supply-weapons-israel-alleged-abuses-human-rights.

40.     This seemingly double standard might be enabling the massive and potentially criminal loss of civilian life in Gaza. While, for example, "Russia's indiscriminate airstrikes on hospitals and schools in Ukraine have rightly drawn condemnation from Biden and other administration officials," "Israel has arguably done the same thing to Gaza's civilian population for…months without any criticism for this tactic from the Biden administration." *See* https://www.hrw.org/news/2024/02/08/how-end-americas-hypocrisy-gaza.

41.     "Other cases that were reviewed by the ILVF, but where US officials ultimately declined to reach consensus and take action, include: (1) the killing of Sanad Salem al-Harbad, a Bedouin man who was allegedly shot twice in the back by Israeli police in March 2022; (2) the killing of Ahmad Jamil Fahd, who was allegedly shot by police and left to bleed to death by a unit of undercover Israeli agents; (3) the alleged assault in Israeli police custody of journalist Givara Budeiri; (4) the 2020 killing of a 32-year-old unarmed autistic man Eyad al-Hallaq by Israeli police in East Jerusalem; (5) the killing of a 15-year-old boy named Mohammed Hamayel; and (6) the shooting of 16-year-old Palestinian Jana Kiswani." *See* https://www.theguardian.com/world/ 2024/jan/18/us-supply-weapons-israel-alleged-abuses-human-rights.

42.     In recent weeks, the International Criminal Court ("ICC") has requested an arrest warrant for Israeli Prime Minister Benjamin Netanyahu for war crimes and crimes against humanity. *See* https://www.nytimes.com/2024/05/20/world/middleeast/icc-arrest-warrants-israel-hamas.html.

43.     Despite repeated reports of GVHR, "Washington has approved more than 100 separate military sales to Israel since its invasion of Gaza, even as officials complain Israeli leaders have not done enough to protect civilians." *See* https://www.washingtonpost.com/national-security/2024/03/06/us-weapons-israel-gaza/. Yet, of those sales, only two approved foreign military sales to Israel totaling more than $250 million have been made public since the start of the conflict. "The triple-digit figure, which has not been previously reported, is the latest indication of Washington's extensive involvement in the polarizing five-month conflict even as top U.S. officials and lawmakers increasingly express deep reservations about Israel's military tactics in a campaign that has killed more than 30,000 people, according to Gaza's health authorities." *Id.*

*Plaintiff's First November 9, 2023 FOIA Request*

44.     On November 9, 2023, via State's online portal, Plaintiff submitted a FOIA request ("Request 1") seeking email communications from June 1, 2023 through the day the request was processed, concerning potential human rights violations committed by Israel using United States weapons and equipment.

45.     Specifically, Plaintiff requested emails and attached files regarding:

> 1.  The following Israeli "units of concern":
>     a.  "Israel Border Police" or "Magav";
>     b.  "General Staff Reconnaissance Unit" or "Sayeret Matkal" of "Hostage Rescue";
>     c.  "YAMMAM" or "Centralized Special Unit" or "Israel's National Counter Terror Unit" and

11

       d. Other units identified by State Personnel as "units of concern."

    2. Human rights concerns relating to the transfer of arms to Israel, including memos attached to the approval of transfers, ensuring the following components were included in the search:

       a. Bureau of Democracy, Human Rights, and Labor;

       b. Bureau of Political Military Affairs including Office of Regional Security and Arms transfers;

       c. Office of Defense Cooperation at the U.S. Embassy Jerusalem; and

       d. Bureau of Near Eastern Affairs.

46. POGO requested a fee waiver explaining that it has no commercial interest in the requested records, which will serve the public interest by contributing to public understanding of operations of the federal government and a better understanding of relevant government procedures.

47. Plaintiff also requested expedited processing for this request citing two of State's requirements for "compelling need" that it meets. First, as required, there is "an urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating information." POGO is a representative of the news media and is primarily engaged in disseminating information. Second, POGO explained that the requested records were also urgently needed given that they relate to an ongoing conflict in Gaza, where a then-imminent ground invasion by Israeli forces further threatened the physical safety and lives of hundreds of thousands of people there.

48. On November 9, 2023, after POGO submitted its request, State sent an email to POGO stating that Request 1 had been assigned the tracking number F-2024-01462 and that a formal acknowledgment would be issued in no later than 10 working days.

49. On January 9, 2024, POGO emailed State for an update on the status of Request 1 and repeated its request for expedited processing.

50.     On February 6, 2024, POGO received a formal acknowledgment for Request 1 via

email. In that email, State invoked unusual circumstances citing 5 U.S.C. § 552(a)(6)(B)(i)-(iii).

In this instance, the claimed unusual circumstances included the need to search for and collect

requested records from other Department offices or Foreign Service posts. Additionally, POGO

was informed that it would not be charged processing fees.

51.     To date, State has not decided POGO's request for expedited processing and

POGO has not received a any further updates on Request 1.

52.     As of May 30, 2024, State's FOIA database lists Request 1 as "In Process" with

an estimated delivery date of December 26, 2023 [sic].

53.     Under U.S.C. § 552(a)(6)(C)(i), Plaintiff has now effectively exhausted all

applicable administrative remedies with respect to Request 1.

*Plaintiff's Second November 9, 2023 FOIA Request*

54.     On November 9, 2023, via State's online portal, Plaintiff submitted a second

FOIA request ("Request 2") seeking email communications from June 1, 2023 through the day

the request was processed, concerning CHIRG.

55.     Specifically, Plaintiff requested emails and attached files regarding:

1.  The delay of the public rollout of CHIRG; and
2.  Any analysis regarding arms transfers to Israel produced under
    CHIRG guidelines, ensuring the following components were
    included in the search:
    a.  Bureau of Democracy, Human Rights, and Labor;
    b.  Bureau of Political Military Affairs including Office of
        Regional Security and Arms transfers;
    c.  Office of Defense Cooperation at the U.S. Embassy
        Jerusalem; and
    d.  Bureau of Near Eastern Affairs.

56.     POGO requested a fee waiver explaining that it has no commercial interest in the

requested records, which will serve the public interest by contributing to public understanding of

13

operations of the federal government and a better understanding of relevant government procedures.

57.     Plaintiff also requested expedited processing for this request citing two of State's requirements for "compelling need" that it meets. First, as required there is "an urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating information." POGO is a representative of the news media and is primarily engaged in disseminating information. Second, POGO also explained that the requested records were urgently needed given that they related to an ongoing conflict in Gaza, where a then-imminent ground invasion by Israeli forces further threatened the physical safety and lives of hundreds of thousands of people there.

58.     On November 9, 2023, after POGO submitted Request 2, State sent an email to POGO stating that Request 2 had been assigned the tracking number F-2024-01464 and that a formal acknowledgment would be issued in no later than 10 working days.

59.     On January 9, 2024, POGO emailed State for an update on the status of Request 2 and repeated its request for expedited processing.

60.     On February 6, 2024, POGO received a formal acknowledgment for Request 2 via email. In that email, State invoked unusual circumstances citing 5 U.S.C. § 552(a)(6)(B)(i)-(iii). In this instance, the claimed unusual circumstances included the need to search for and collect requested records from other Department offices or Foreign Service posts.

61.     On March 7, 2024, State emailed POGO advising that Request 2 had been moved to the "In Process" phase.

62.     To date, State has not decided POGO's request for expedited processing and POGO has not received any further updates on Request 2.

63.     As of May 30, 2024, State's FOIA database lists Request 2 as "In Process" with

an estimated delivery date of December 26, 2023 [sic].

64.     Under U.S.C. § 552(a)(6)(C)(i), Plaintiff has now effectively exhausted all

applicable administrative remedies with respect to Request 2.

**PLAINTIFF'S CLAIN FOR RELIEF**

**CLAIM ONE**
**(Failure to Grant Expedition)**

65.     Plaintiff repeats and re-alleges paragraphs 1-64.

66.     Plaintiff properly asked that State expedite the processing of Plaintiff's two FOIA

requests, which seek records within the custody and control of State, based on its showing of an

urgency to inform the public about an actual or alleged federal government activity made by a

person primarily engaged in disseminating information and the urgent need for records related to

the ongoing conflict in Gaza that threatens the physical safety and lives of hundreds of thousands

of people there.

67.     Defendant State failed to comply with the statutory time limit for making a

determination on Plaintiff's requests for expedition and improperly failed to process Plaintiff'

requests on an expedited basis.

68.     Plaintiff has exhausted all applicable administrative remedies with respect to

Defendant State's failure to make a determination on Plaintiff's requests for expedition.

69.     Plaintiff therefore is entitled to injunctive and declaratory relief with respect to the

immediate and expedited processing and disclosure of the requested records.

**CLAIM TWO**
**(Wrongful Withholding of Non-Exempt Records)**

70.     Plaintiff repeats and re-alleges paragraphs 1-69.

15

71.     Plaintiff properly asked for records within the custody and control of the U.S. Department of State.

72.     Defendant State wrongfully withheld agency records requested by Plaintiff by failing to comply with the statutory time limit for making a determination on Plaintiff's expedited requests and by withholding from disclosure records responsive to Plaintiff's requests.

73.     Plaintiff POGO is therefore entitled to injunctive and declaratory relief with respect to the immediate processing and disclosure of the records requested in its two November 9, 2023 FOIA requests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Order Defendant to immediately and fully process plaintiff's two November 9, 2023 expedited FOIA requests and to disclose all non-exempt documents immediately and at no cost to Plaintiff;

(2)     Issue a declaration that Plaintiff is entitled to immediate and expedited processing and disclosure of the requested records at no cost to Plaintiff;

(3)     Provide for expeditious processing in this action;

(4)     Retain jurisdiction of the action to ensure no agency records are wrongfully withheld;

(5)     Award Plaintiff its costs and reasonable attorney's fees in this action; and

(6)     Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/Anne L. Weismann
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, NW

                                    Suite 640
                                    Washington, DC 20015
                                    Weismann.anne@gmail.com
Dated:        June 5, 2024          *Attorney for Plaintiff*